238 N.J. Super. 41 (1990)
568 A.2d 1213
THEODORE RUDBART, NATALIE RUDBART, BEVERLY LITOFF AND BENJAMIN WELTMAN, PLAINTIFFS-APPELLANTS,
v.
NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION AND FIRST FIDELITY BANK, N.A., DEFENDANTS-RESPONDENTS. MADELINE OKIN, FOR HERSELF AND ON BEHALF OF ALL OTHER PERSONS SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS,
v.
NORTH JERSEY DISTRICT WATER SUPPLY COMMISSION AND FIRST FIDELITY BANK, N.A., NEW JERSEY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued September 18, 1989.
Decided January 19, 1990.
*43 Before Judges J.H. COLEMAN, MUIR and SKILLMAN.
James J. DeLuca argued the cause for appellants (Okin, Cohen and Hollander, attorneys for Madeline Okin, and Gurtman, Shurkin & Brunt, attorneys for Theodore Rudbart, et al.; Thomas F. Brunt and James J. DeLuca, on the brief).
Michael A. Lampert argued the cause for respondent First Fidelity Bank, N.A. (St. John, Oberdorf, Williams, Edington & Curtin, attorneys; Robert J. Shaughnessy, Jr. and Michael A. Lampert, on the brief).
No appearance was made on behalf of respondent North Jersey Water Supply Commission.
The opinion of the court was delivered by SKILLMAN, J.A.D.
*44 Defendant North Jersey District Water Supply Commission (the Commission) is a public body which operates and maintains a public water system that serves northern New Jersey. To provide interim financing for a portion of the cost of constructing a new water supply facility and to pay certain outstanding obligations, the Commission authorized the issuance of $75,000,000 in new project notes bearing interest at a rate of 7 7/8% per annum. Defendant First Fidelity Bank, N.A. (Fidelity)[1] was one of the Commission's underwriters as well as the indenture trustee and the registrar/paying agent for the notes. Plaintiffs were purchasers of the notes.
The Commission issued the project notes on or about June 15, 1984. Since the notes were in registered form, Fidelity had the address of each noteholder, to which it mailed interest payments semi-annually on June 15 and December 15. The notes had a stated term of three years but could be called for early redemption.
At some point each noteholder apparently received a copy of the Commission's offering statement, which set forth the terms of the notes. This document included a section which stated:
The Notes are subject to redemption prior to maturity as a whole at the option of the Commission on 30 days published notice in a newspaper or newspapers of general circulation in the City of Newark, New Jersey and in the City of New York, New York on the dates and at the prices below:
* * * * * * * *
If on the date fixed for redemption sufficient monies are available to the Trustee to pay the redemption price plus interest accrued to the date of redemption, the Notes shall cease to bear interest and shall not be deemed to be outstanding from such date.
The fine print on the back of each note included similar language.
*45 In the summer of 1985 the Commission decided to exercise its option to redeem the notes prior to maturity. Consequently, it entered into an "escrow deposit agreement" with Fidelity, effective September 26, 1985, pursuant to which it fixed June 23, 1986 as the date of redemption.
Subsequent to the execution of this agreement, Fidelity sent two semi-annual interest payments by mail to the addresses previously designated by the noteholders. Neither mailing mentioned the scheduled early redemption of the notes. Moreover, neither Fidelity nor the Commission directly communicated in any other way with the plaintiffs regarding the redemption. Rather, the only notice of the early redemption given to the plaintiffs was by publication in several New York area newspapers and in Moody's Municipal and Government Manual.
As of December 15, 1986, nearly six months after the redemption date, the holders of approximately $10 million worth of the $75 million in project notes originally issued still had not redeemed their notes. After receiving telephone calls and written complaints from noteholders regarding their failure to receive interest payments on December 15, 1986, Fidelity, at the Commission's behest, provided mail notice in January of 1987 to the noteholders who had not yet redeemed. Most of these noteholders then redeemed their notes. However, they were only paid the redemption price (101% of the face value of the notes) plus interest from June 15, 1986 to June 23, 1986. The Commission and Fidelity refused to pay any interest for the period subsequent to June 23, 1986.
Plaintiffs Theodore Rudbart, et al and Madeline Okin filed separate class actions in Passaic and Bergen counties against the Commission and Fidelity, alleging that the notice of the early redemption had been inadequate and seeking, among other things, interest from June 23, 1986 to the date of redemption. The trial court certified the Passaic County complaint as a class action and subsequently the complaints were consolidated in Passaic County.
*46 Plaintiffs and Fidelity filed cross-motions for summary judgment. Thereafter, these parties entered into a stipulation of facts on the liability aspects of the case, reserving the right to adduce additional evidence on the issue of damages should that become necessary. The trial court heard oral argument on September 2, 1988 and issued a written opinion on September 14, 1988 directing that summary judgment be granted in favor of the defendants. The trial court found that the offering statement and notes "clearly indicated" that "the only notice of redemption" the noteholders would receive would be by newspaper publication and concluded that this "agreed upon notice" was "binding on the plaintiffs and ... not deficient as a matter of law."
While this matter was pending before the trial court, another noteholder who failed to see published notice of the redemption filed a class action in the United States District Court for New Jersey, Ellovich v. First Fidelity Bank, N.A., New Jersey, et al., Docket No. 87-650. In a written opinion filed March 2, 1988, the district court found that the plaintiff in that action had not presented any evidence that Fidelity failed to disclose a material fact in connection with the offering and consequently granted Fidelity's motion for summary judgment with respect to plaintiff's Rule 10b-5 claim, 17 C.F.R. § 240.10b-5 (1989). However, the federal court declined to exercise pendent jurisdiction with respect to state law claims. Consequently, the court expressly noted that "its ruling on plaintiff's federal claim provides no indication as to the viability of plaintiff's state law claims. The state court is the proper forum for the litigation of these causes of action." The Third Circuit Court of Appeals subsequently affirmed the dismissal of this federal complaint.
Plaintiffs appeal from the dismissal of their complaints, arguing, among other things, that the project notes are "a classic example of a contract of adhesion" and that "it would be unjust to allow either the Commission or First Fidelity to benefit as a result of their failure to provide adequate notice of the redemption *47 to the Note holders." Fidelity argues that the terms of an investment contract are not subject to invalidation on the grounds of unconscionability or unfairness.[2] In the alternative, Fidelity argues that published notice in the newspaper constituted adequate notice to plaintiffs of the early redemption of their notes.
We conclude that a note or other security sold to the general investing public pursuant to standard form contractual provisions is a contract of adhesion. Consequently, if the security contains an unfair provision or the issuer fails to deal fairly with the investors, the issuer and its agents may be liable for any resulting damages. We also conclude that the failure of the Commission and Fidelity to give mail notice of the early redemption of the project notes was unfair. Therefore, we reverse the judgment in favor of defendants and remand the matter for a determination of damages.

I
Although it is "[a] basic tenet of the law of contracts ... that courts should enforce contracts as made by the parties ..., courts have become increasingly sensitive to overreaching in contracts where there is an inequality in the status of the parties." Vasquez v. Glassboro Service Ass'n, Inc., 83 N.J. 86, 101, 415 A.2d 1156 (1980). Thus, the courts have recognized that "[a] contract where one party ... must accept or reject the contract does not result from the consent of that party." Id. at 104, 415 A.2d 1156. Such a contract is "a contract of adhesion" whose "legitimacy rests entirely on its compliance with standards in the public interest." Id. at 104, 415 A.2d 1156, quoting Slawson, Standard Form Contracts and Delegation of Lawmaking Power, 84 Harv.L.Rev. 529, 566 (1971); see also Rakoff, *48 Contracts of Adhesion: An Essay in Reconstruction, 96 Harv.L.Rev. 1174 (1983). Consequently, "[g]rossly unfair contractual obligations ... which result in an assumption by the other contracting party of a burden which is at odds with the common understanding of the ordinary and untrained member of the public, are considered unconscionable and therefore unenforceable." Ellsworth Dobbs, Inc. v. Johnson, 50 N.J. 528, 554, 236 A.2d 843 (1967). "Moreover, in every contract there is an implied covenant of good faith and fair dealing." Onderdonk v. Presbyterian Homes of N.J., 85 N.J. 171, 182, 425 A.2d 1057 (1981).
Our courts have invalidated unconscionable or unfair contractual terms in a variety of contexts. See, e.g., Henningsen v. Bloomfield Motors, 32 N.J. 358, 385-404, 161 A.2d 69 (1960) (consumer contract for sale of automobile); Ellsworth Dobbs, Inc. v. Johnson, supra, 50 N.J. at 552-556, 236 A.2d 843 (listing agreement between real estate broker and seller of property); Allen v. Metropolitan Ins. Co., 44 N.J. 294, 208 A.2d 638 (1965) (insurance policy); Vasquez v. Glassboro Service Ass'n, supra, 83 N.J. at 97-105, 415 A.2d 1156 (lease of living quarters by farmer to migrant farm worker); Shell Oil Co. v. Marinello, 63 N.J. 402, 307 A.2d 598 (1973) (franchise agreement); see also Ingersoll Rand Co. v. Ciavatta, 110 N.J. 609, 627, 542 A.2d 879 (1988) ("contractual provisions that require assignment of post-employment inventions ... must be fair, reasonable, and just."); Solari Industries, Inc. v. Malady, 55 N.J. 571, 576, 264 A.2d 53 (1970) (covenant not to compete after termination of employment will be enforced only to the extent it "protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public."); see generally Corbin on Contracts, § 559A-§ 559I (Supp. 1989).
We are satisfied that the decisions dealing with contracts of adhesion in other contexts point to the conclusion that the terms of notes and other securities sold to the general investing public and the exercise by issuers and their agents of *49 their rights under such instruments are subject to judicial review on the basis of alleged unconscionability or unfairness. Like consumer contracts, Henningsen v. Bloomfield Motors, supra, insurance policies, Allen v. Metropolitan Ins. Co., supra, residential leases, Vasquez v. Glassboro Service Ass'n, supra, and franchise agreements, Shell Oil Co. v. Marinello, supra, securities generally are contracts of adhesion, drafted by the issuer and presented to the purchaser on a take it or leave it basis. Moreover, offering statements, like other documents which the courts have viewed as contracts of adhesion, are lengthy and difficult to understand. For example, the Commission's offering statement for the project notes was 110 pages long, with 37 different sections and subsections and 5 appendices. Therefore, members of the general investing public cannot reasonably be expected to understand the entire offering statement before deciding whether to purchase a particular security.[3] Under these circumstances, as in connection with other contracts of adhesion, it is appropriate for the courts to afford protection to purchasers of securities from unconscionable contractual terms and other forms of overreaching by the issuers and their agents. See Note, "Convertible Securities: Holder Who Fails to Convert Before Expiration of the Conversion Period," 54 Cornell L.Rev. 271, 272 (1969).

II
We consider next whether defendants' failure to give notice by mail to the noteholders of the early redemption was such unconscionable or unfair conduct. The leading cases dealing with the fairness of notice have involved the requirements of the Due Process Clause of the Fourteenth Amendment. In that context, the courts have recognized that the *50 fairness of a method of notice "depends on the particular circumstances." Tulsa Professional Collection Services, Inc. v. Pope, 485 U.S. 478, 108 S.Ct. 1340, 99 L.Ed.2d 565 (1988). Where substantial property rights are involved, ordinarily "within the limits of practicality notice must be such as is reasonably calculated to reach interested parties." Mullane v. Central Hanover Bank & Trust Co., 339 U.S. 306, 318, 70 S.Ct. 652, 659, 94 L.Ed. 865 (1950). Notice by publication in the newspaper is considered adequate under some circumstances, especially where it is supplemental to other action likely to come to the attention of the affected party or where it is not reasonably possible or practical to give more adequate notice. Id., 339 U.S. at 316-318, 70 S.Ct. at 658-659. However, if substantial rights are involved, no other notice is likely to come to the attention of the affected party and it is feasible to provide more reliable notice, publication is not considered a fair form of notice. Id., 339 U.S. at 318-320, 70 S.Ct. at 659-660. The Court aptly observed in Mullane that:
Chance alone brings to the attention of even a local resident an advertisement in small type inserted in the back pages of a newspaper, and if he makes his home outside the area of the newspaper's normal circulation the odds that the information will never reach him are large indeed.
* * * * * * * *
Publication may theoretically be available for all the world to see, but it is too much in our day to suppose that each or any individual beneficiary does or could examine all that is published to see if something may be tucked away in it that affects his property interests. [Id., 339 U.S. at 315, 320, 70 S.Ct. at 657, 660].
These observations regarding the fairness of notice by publication in the context of the due process requirements of the Fourteenth Amendment are equally applicable in the present context. The noteholders certainly have property rights in the notes and the continued payment of interest on the notes at least equal to the property rights of the trust beneficiaries involved in Mullane. Moreover, Fidelity has not suggested any reason why the test of the fairness of notice in the present context should be different from that in Mullane simply because *51 the redemption of plaintiffs' notes could be accomplished without resort to judicial proceedings.
Applying the principles expressed in Mullane, we conclude that the notice by publication provided by defendants did not constitute fair notice of the early redemption. Initially, we note that the Commission never directly advised the purchasers of the notes that the only notice they would receive of an early redemption would be through published notice in the newspaper. The offering statement indicates that early redemption would be "on 30 days published notice in a newspaper or newspapers of general circulation in the City of Newark, New Jersey and the City of New York, New York." The back of the project notes contains similar language. However, neither document explicitly warned purchasers that newspaper notice would be the only notice they would receive. Consequently, we are unwilling to assume that an unsophisticated investor would have understood the language relied upon by defendants to mean that no other notice of redemption would be provided.
Furthermore, the offering statement and notes do not indicate any specific newspaper in which a notice of early redemption would be published. Therefore, even an investor who understood that only published notice of any early redemption would be given would have had to buy every newspaper of general circulation published in Newark or New York and read through the published notices every day while the notes were outstanding. We consider it unreasonable to expect an investor who has purchased a $5,000 project note, which may be only one of numerous securities he owns, to assume this burden.[4]
*52 Our conclusion that the published notice of the early redemption was not reasonably calculated to reach all noteholders and hence was unfair is supported by the common understanding in the securities industry that notice of the redemption of registered securities will be given by mail. The Securities and Exchange Commission has issued guidelines for bond redemptions, entitled "Voluntary Minimum Standards for Processing Redemptions of Debt Securities," which recognize that only notice by mail is reasonably calculated to reach individual investors. Indeed, these guidelines suggest that notice of a redemption should be given by registered or certified mail or overnight delivery service:
[T]he Commission ... recognizes that many bondholders' certificates are not held by depositories, but are held individually or through other custodians. These bondholders, in the Commission's view, are often the least informed about the redemption process and bear significant financial loss due to missed redemptions and late redemption payments. The Commission, therefore, encourages voluntary efforts to improve the process by which these bondholders are informed of redemptions and are paid redemption proceeds. Issuers, their agents, and trustees should consider secured mailings [e.g., registered or certified mail or overnight delivery service] to all registered bondholders, follow-up notices to bondholders who have failed to deliver called bonds, mailed notices to holders of bearer bonds who provide their names and addresses for that purpose, and redemption notice publication in sources most likely to reach bondholders. [SEC Exchange Act Release No. 23,856 (December 3, 1986)].
The Model Debenture Indenture Provisions published by the American Bar Foundation also recognize that notice of any early redemption to holders of registered securities should be provided by mail:
Notice of redemption shall be given by first-class mail, postage prepaid, mailed not less than 30 nor more than 60 days prior to the Redemption Date, to each Holder of Debentures to be redeemed, at his last address appearing in the Debenture Register. American Bar Foundation Corporate Debt Financing Project, Model Debenture Provisions  All Registered Issues, § 1105 at 68 (1967).
*53 Indeed, the senior vice president of Fidelity's own trust department testified in a deposition that the project notes issued by the Commission were the only registered public security of the more than 2,000 with which he was familiar which provided for notice of redemption solely by publication.[5]
Defendants have not even suggested that they had any reasonable basis for failing to give the holders of the project notes mail notice of the early redemption. Since the notes were registered, defendants had the addresses of all the noteholders. In fact, since Fidelity mailed two interest payments subsequent to the decision to redeem the notes, the last one on June 15, 1986 only eight days prior to the redemption date of June 23, 1986, notice of the early redemption could have been enclosed with these payments without defendants' incurring any significant cost. Therefore, the only plausible business reason for not giving the noteholders mail notice was to prevent a significant percentage of them from learning of the redemption, thus providing the defendants with the use of their capital for some period of time without the payment of interest. Because such an objective would be fundamentally unfair, we conclude that the published notice of redemption given by defendants was ineffective to suspend the running of interest on the unredeemed notes. See Corbin, supra, § 559E.
This conclusion is supported by the Second Circuit's decision in Van Gemert v. Boeing Co., 520 F.2d 1373 (1975), cert. den. *54 423 U.S. 947, 96 S.Ct. 364, 46 L.Ed.2d 282 (1975). In that case, Boeing shareholders were given the right to purchase a convertible debenture which was subject to redemption on not less than 30 days notice. Although shareholders who purchased the debentures were given the option of registering them, in which event they would receive notice by mail of any redemption call, only 7% of the purchasers exercised this option. Purchasers who did not register their debentures were entitled only to published notice of any redemption. Boeing exercised its right to redeem when the stock into which the debentures could be converted was worth more than triple their redemption value. A substantial number of unregistered debenture-holders failed to see the published notice and consequently failed to convert the debentures to common stock prior to the redemption date, at which time the conversion right expired.
A class action was brought by the debenture-holders who had failed to convert their debentures prior to the redemption date. One of the plaintiffs' contentions was that the indenture governing the debentures was a contract of adhesion between parties of disparate bargaining power, the unconscionable features of which were unenforceable as a matter of law. The court agreed with this contention and held that Boeing had an obligation to give "reasonably adequate notice of the redemption to the debenture holders." 520 F.2d at 1375. The court stated that "[t]he debenture holder's expectancy is that he will receive reasonable notice and it is his reliance on this expectancy that the courts will protect." 520 F.2d at 1385. The court concluded that Boeing had failed to adequately inform the purchasers of the debentures of the advantages of registration:
Investors were not informed by the prospectus or by the debentures that they could receive mail notice by registering their debentures, and that otherwise they would have to rely primarily on finding one of the scheduled advertisements in the newspaper or on keeping a constant eye on the bond tables. [520 F.2d at 1383].
The court also concluded that the newspaper notice of the redemption given by Boeing was inadequate. Consequently, *55 Boeing was held liable for the damages suffered by the non-converting debenture-holders.
Fidelity argues that Van Gemert is distinguishable because the investors in that case were not told in the offering statement or the security itself how they would receive notice of any redemption. Fidelity relies upon the part of the Second Circuit's opinion following the remand in Van Gemert, reported at 553 F.2d 812 (2nd Cir.1977) (Van Gemert II), which states:
We did find significant [in Van Gemert I] ... the fact that the debentures did not explicitly set forth the type of notice which appellants could expect if Boeing decided to call the bonds. Without such a declaration, we held as a matter of law that appellants were entitled to expect that Boeing would employ a method of notification reasonably calculated to inform the debenture holders of the call. [Id. at 815].
However, the court did not state in either Van Gemert I or Van Gemert II that any form of notice, no matter how inadequate, would be sustained if it were set forth in the offering statement or the security. In fact, immediately following the passage from Van Gemert II relied upon by Fidelity, the court stated that
[Van Gemert I] merely applied the settled principle, "that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract...." Simply stated, every contract contains the implied requirement of good faith and fair dealing. [Ibid.; citations omitted].
Fidelity also relies upon the statement in Meckel v. Continental Resources Co., 758 F.2d 811, 816 (2nd Cir.1985) that in Van Gemert I "[i]t was the total lack of a notice provision in the debentures that we held necessary as a condition precedent to an imposition of a duty to provide `reasonable' notice." However, the indenture involved in Meckel did provide for notice by mail of any redemption, and the court in that case specifically stated that "[i]n our view the provision in the debenture that notice would be given `by mail' was not inherently unfair or unreasonable and it satisfied the debenture holders' reasonable expectations as to the notice they would receive." 758 F.2d at 816. Consequently, the court in Meckel had no occasion to *56 consider the fairness or enforceability of a provision for notice of the redemption of a registered security by publication only.
In any event, even if we read Van Gemert and Meckel as narrowly as Fidelity urges, we would conclude that New Jersey's approach to the enforcement of adhesive contractual terms, exemplified by Henningsen, Allen, Ellsworth Dobbs, Marinello and Vasquez (see infra at 47-49, 568 A.2d at 1216-1217), indicates that the published newspaper notice of the early redemption utilized by defendants was unfair and thus invalid, because it was not reasonably calculated to provide actual notice of the redemption to individual investors and defendants did not show any legitimate business reason for failing to give notice by mail.

III
Fidelity makes several other arguments which require brief comment. First, it argues that plaintiffs' claim is barred under principles of collateral estoppel by the federal district court's decision in Ellovich. More specifically, Fidelity argues that the district court found that the offering statement adequately disclosed to the plaintiff class that the sole notice of redemption would be by publication.
The short answer to this argument is that the district court's opinion contains no such finding. In fact, the district court expressly declined to consider the fairness of notice by publication, stating:
Plaintiff contends that Rule 10b-5 required the Bank to disclose ... that notice by publication was likely to be ineffective. Plaintiff presents evidence that the Bank knew that the notice by publication might be less effective than notice by mail, the usual method for providing notice of optional redemption of registered notes.
Even assuming that the Bank was aware of the probable ineffectiveness of notice by publication, Rule 10b-5 does not require disclosure of such a fact. Such a requirement would be tantamount to compelling defendants to disclose (a) that their intention was to collect interest on unclaimed funds from investors who failed to receive actual notice of redemption, or (b) that such a plan was unlawful. As stated above, Rule 10b-5 does not require defendants "to confess a corporate wrongdoing or the invalid purpose of an act." [Citation omitted].
*57 Therefore, the district court in Ellovich rejected plaintiff's claim under Rule 10b-5 without making any finding as to the fairness of notice of the early redemption by publication only.
Fidelity also relies upon N.J.S.A. 17:9A-35D for the proposition that it cannot be held liable to plaintiffs for interest on the notes subsequent to the redemption date. However, this subsection was not enacted until December 10, 1986, nearly six months after Fidelity failed to give plaintiffs adequate notice of the early redemption of their notes. Consequently, it has no applicability to this case. In any event, this subsection is not addressed to the liability of a bank which breaches its duties while acting as an agent for an issuer of securities.[6]
For the reasons previously stated, we reverse the judgment in favor of defendants and remand the matter for a determination of damages.
NOTES
[1] Fidelity is the successor in interest of First National State Bank, which was identified in the Commission's supplemental resolution authorizing issuance of the project notes as an underwriter, the registrar/paying agent and the indenture trustee.
[2] Although plaintiffs seek reversal of the judgment entered below as against both Fidelity and the Commission, the Commission has not participated in this appeal.
[3] Indeed, Fidelity acknowledged at oral argument that offering statements frequently are not even sent to the purchaser of a security until after the security has been bought. The record does not indicate whether plaintiffs received the offering statements before or after they purchased the securities.
[4] At oral argument, Fidelity urged that the brokers through whom the notes were purchased had a duty to give notice of the redemption to their customers and that defendants were entitled to rely upon that notice. However, defendants have not cited any statute, administrative regulation or judicial decision which imposes such a duty upon brokers. Nor has our independent research revealed any authority establishing such a duty. Consequently, we are unwilling to assume that brokers have such a legal duty or that they generally provide such notice to their customers as a matter of practice. In any event, even if some brokers give notice to their customers of redemptions which come to their attention, this would not absolve defendants of their responsibility to give notice reasonably calculated to reach noteholders.
[5] Fidelity apparently suggested to the Commission that the noteholders be given notice by mail. The federal district court's opinion in Ellovich contains the following description of the circumstances under which notice of the redemption was given by newspaper publication rather than by mail:

Prior to the issuance of the offering statement, the Bank's counsel suggested that notice of optional redemption be provided by mail rather than publication. Counsel's suggestion was based on his understanding that notice of redemption of registered notes was normally accomplished by mail and that mail was the most effective means of providing notice to bondholders. At the Commission's urging, however, the Bank kept the publication provision in the governing resolution and the offering statement.
[6] We have no occasion on this appeal to decide which defendant bears primary responsibility for the failure to give adequate notice of the early redemption. We also do not decide the scope of the class entitled to recover damages or the manner in which damages should be calculated. These issues should be addressed on remand.